**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| PERFORMANCE POWERSPORTS GROUP INVESTOR, LLC, *et al.*[1] | Case No. 23-10047 (LSS) |
| Debtors. | (Jointly Administered) |
| PETER KRAVITZ, SOLELY IN HIS CAPACITY AS LITIGATION TRUSTEE, | |
| Plaintiff, | Adv. No. |
| v. | |
| RICHARD GODFREY, TODD GENTRY AND ROBERT C. HUNTER, | |
| Defendants. | |

## COMPLAINT

Plaintiff Peter Kravitz, solely in his representative capacity as trustee ("Plaintiff" or the "Litigation Trustee") of the litigation trust (the "Litigation Trust") established in connection with the *Debtors' Second Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 463] (the "Plan") filed by Performance Powersports Group, Inc., f/k/a Rich Godfrey & Associates Inc. d/b/a Coleman Powersports ("PPG"), Performance Powersports Group Investor, LLC ("Investor"), Performance Powersports Group Holdings, Inc. ("Holdings") and Performance Powersports Group Purchaser, Inc. ("Purchaser," and collectively with PPG, Investor

---

[1] The Post-Effective Date Debtors in these chapter 11 cases, along with the last four digits of each of the Post-Effective Date Debtors' respective federal tax identification numbers, are as follows: Performance Powersports Group Investor, LLC (2068); Performance Powersports Group Holdings, Inc. (0823); Performance Powersports Group Purchaser, Inc. (1533); and Performance Powersports Group, Inc. (3380). The Post-Effective Date Debtors' headquarters and mailing address is: 1775 East University Drive, Tempe, Arizona 85281.

and Holdings, the "Debtors"), by and through his undersigned counsel, alleges the following based upon his investigation to date and knowledge, information and belief:

## NATURE OF THE ACTION

1.      Plaintiff brings this action to avoid and recover the value of over $72 million of cash and $6 million of cancelled debt transferred by PPG to or for the benefit of Richard Godfrey ("Godfrey"), Todd Gentry ("Gentry") and Robert "Christopher" Hunter ("Hunter," and collectively with Godfrey and Gentry, the "Defendants") pursuant to a leveraged buyout (the "LBO").  No consideration was provided to PPG for the $45 million of secured term debt it was saddled with to finance the LBO,[2] which rendered the company insolvent, inadequately capitalized, and unable to pay debts as they came due *for reasons then known only to the Defendants*.

2.      The evidence and expert testimony will support the conclusion that PPG received less than reasonably equivalent value for the transfers to the Defendants, and that the LBO rendered PPG balance sheet insolvent, grossly undercapitalized and unable to pay its debts as they came due following the LBO.  As such, §§ 548 and 550 of the Bankruptcy Code dictate the avoidance and recovery of the transfers made to or for the benefit of the Defendants as constructive fraudulent transfers for the benefit of the Debtors' unpaid creditors, who were left holding the bag while Godfrey cashed out his equity and directed gratuitous payments to Hunter and Gentry in a transaction that marched PPG into Chapter 11 only 15 months later.

---

[2] The LBO was financed with (i) $47 million in equity contributions, $45 million of which came from Kinderhook Capital Fund VI, L.P. and Kinderhook Capital Fund VI-B, L.P. (collectively with Kinderhook Industries, Inc., "Kinderhook") and over $2 million of which came from certain investors associated with Twin Brook Capital Partners LLC ("Twin Brook"), and (ii) $45 million in secured term debt and $7.5 million of secured revolving financing provided by Twin Brook

**JURISDICTION AND VENUE**

3.      This is an adversary proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because it seeks to recover money or property of the Debtors' estate.

4.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012, all of which was preserved under the Plan and Litigation Trust.  Venue of this proceeding is proper under 28 U.S.C. § 1409.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

5.      Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware and Rule 7008(a) of the Federal Rules of Bankruptcy Procedure, Plaintiff consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**PARTIES**

6.      Plaintiff is Peter Kravitz, solely in his capacity as the Litigation Trustee of the Litigation Trust established pursuant to the confirmed Plan.  The Litigation Trust was established for the purpose of prosecuting certain causes of action, including all claims of the Debtors against the Defendants, and liquidating and distributing the property of the Litigation Trust in accordance with the Plan.

7.      Defendant Godfrey is the founder of PPG and a former officer, director and equity holder of PPG.  Upon information and belief, Godfrey is a resident of Arizona.

8.    Defendant Gentry is the former Vice President of Business Development of PPG. Upon information and belief, Gentry is a resident of Arizona.

9.    Defendant Hunter is the former Chief Financial Officer and Chief Operating Officer of PPG.  Upon information and belief, Hunter is a resident of Arizona.

## FACTUAL BACKGROUND

**A.    Godfrey Founds PPG and Creates Ties with China-Based Manufacturers**

10.    In 2010, Godfrey founded PPG, an Arizona corporation.  Godfrey was the sole shareholder, chief executive officer and sole member of PPG's board of directors.

11.    PPG was a lower-cost producer of high-quality, light-to-middle weight powersports equipment.  The company primarily sold all-terrain vehicles ("ATV"), utility task vehicles ("UTV"), mini-bikes and go karts through prominent national and regional big box retailers. Walmart, Tractor Supply Co. and Camping World, Inc. were among PPG's largest customers.  The company leased two facilities in Tempe, Arizona from entities owned by Godfrey – it used one for its corporate headquarters and retail showroom and the other for its manufacturing and assembly operations.

12.    PPG primarily utilized overseas suppliers and partnered with vendors that had manufacturing facilities in China, Vietnam and Texas.  The company's primary manufacturing partner was Chongqing Huansong Industries (Group) Co., Ltd. and its partner company in Haiphong, Vietnam ("Hisun China").  Most of PPG's products were sourced from Hisun China or its U.S. affiliate, Hisun Motors Corp. USA ("Hisun USA," and collectively with Hisun China, "Hisun"), which has a distribution facility in Texas that was utilized for UTV assembly and additional warehousing.  The company's other primary vendor was Sundance GS LLC ("Tao"), another China-based company that manufactured ATVs.

13.    The Hisun relationship was a crucial component of PPG's business.  Godfrey had a long-standing relationship with Hisun and purportedly had a close personal relationship with its founder and chairman, Song Li, Sr.  Beginning in 2021, however, PPG began to fall farther behind on its payments to Hisun.  Godfrey effectively utilized his relationship with Hisun to continue procuring inventory that PPG did not and could not fully pay for following the LBO.  This objectively flawed business model, through which Godfrey expected Hisun to provide PPG with an unsecured line of credit that stood in direct conflict with the parties' contractual relationship, was not fully disclosed to Kinderhook until months after the LBO closed.

**B.    Godfrey Sells PPG**

14.    In March 2021, PPG retained Hudson Capital Advisors BD, LLC ("Hudson Capital Advisors") as an investment banker to market a potential acquisition of or investment in PPG.  As part of that process, Hudson Capital Advisors approached Kinderhook with the potential transaction opportunity.  Kinderhook ultimately submitted a letter of intent to purchase PPG and soon thereafter began negotiating a definitive agreement with Godfrey.

15.    During the diligence process, Kinderhook discovered certain limited accounting irregularities in PPG's books and records, leading Kinderhook to reduce the amount of its initial offer.   Notably, PPG's accounting practices did not follow generally accepted accounting principles.

16.    Upon information and belief, Godfrey did not disclose to Kinderhook the materiality of PPG's overdue payables to Hisun during the diligence process.  As of September 7, 2021 (approximately one month prior to the closing of the LBO), PPG owed Hisun approximately $60.4 million for shipped but unpaid inventory, with approximately $8.3 million overdue.  At the closing of the LBO, those amounts had increased to $64.7 million and $12.5 million, respectively.

17.    Upon information and belief, Kinderhook would not have moved forward with the transaction under the agreed upon transaction terms had it known the true extent of the Hisun arrearages and PPG's reliance on its payment delinquency with Hisun to meet its past and future cash flow needs.

18.    PPG's last month-end balance sheet prior to the closing of the LBO, dated September 30, 2021 (just days prior to the closing of the LBO) (the "September 2021 Balance Sheet"), showed assets of $78.9 million, including $9.1 million of inventory on hand and $28.3 million of "external inventory in transit," and liabilities of $67.3 million, resulting in a stated implied equity value of $11.5 million.

19.    The LBO closed on October 8, 2021.  Despite PPG's $11.5 million stated implied equity value on the September 2021 Balance Sheet, Godfrey and his affiliate received a staggering payout of over $76 million in cash and debt cancellation in exchange for his equity in PPG.  In addition, Godfrey directed gratuitous payments to be made shortly after the closing to five PPG employees totaling nearly $6 million, including over $2 million in payments made to Hunter and Gentry.[3]

20.    The LBO was financed with both equity and debt, including (i) $47 million in equity contributions, $45 million of which came from two Kinderhook funds and over $2 million of which came from certain investors associated with Twin Brook, and (ii) $45 million in secured term debt and $7.5 million of secured revolving financing provided by Twin Brook.  In addition, the transaction's stated purchase price implied a $20 million value to account for 2,183 of Godfrey's 10,000 shares in PPG that were rolled into shares in Investor, PPG's new ultimate parent company.

---

[3] The other three employees who received similar payments totaling over $3 million were released as part of the bankruptcy sale and thus are not included as defendants.

21.     According to the Debtors' bankruptcy petitions, Investor was owned by Kinderhook Capital Fund VI, L.P. (44.5%), Kinderhook Capital Fund VI-B, L.P. (20%), Godfrey (28.7%), Twin Brook's affiliates (2.9%) and other equity holders (4%).  Investor wholly owned the intermediate company, Holdings, which in turn wholly owned another intermediate company, Purchaser.  Purchaser owned 100% of the stock in PPG, the operating entity that was wholly owned by Godfrey immediately prior to the closing of the LBO.

22.     The proceeds and other consideration from the LBO were distributed as follows: (i) Godfrey received $69,848,532.99 in cash, plus the cancellation of $6,435,452.22 in debts owed to PPG by Godfrey individually ($4,943,550.31) and by his affiliate Yerf-Dog Geneva 444 LLC ("Yerf-Dog") ($1,491,901.91); (ii) $2,810,324 to PPG for transaction fees and expenses; (iii) $3,393,964.70 for other transaction fees and expenses; (iv) $714,182 in California state taxes owed by PPG; and (v) $6 million in gratuitous "bonuses" and employer payroll taxes to five employees, including $1,114,724 each to Hunter and Gentry plus applicable income taxes.[4]

23.     PPG received no consideration in exchange for the obligations it was compelled to undertake and the debt it was compelled to forgive by Godfrey to consummate the LBO and finance the Defendants' extractions.

24.     Immediately following the closing of the LBO, Godfrey remained in his role as chief executive officer and retained a seat on the board of directors.

---

[4] While the LBO's adjusted stated deal price was $100 million, the effective purchase price, even assuming all other amounts were properly reported and valued, was considerably less.  Had an appropriate amount of working capital been deducted from the nominal deal price (the amount of working capital provided for in the deal was clearly inadequate as discussed *infra*), the implied total purchase price was considerably less than $100 million.

**C.     LBO Renders PPG Insolvent on a Balance Sheet Basis**

25.     The LBO rendered PPG insolvent by a deficit of tens of millions of dollars.  As discussed *supra*, the September 2021 Balance Sheet, which does not ascribe any values for goodwill or intangible assets, shows an implied stated equity value of $11.5 million.  PPG's post-closing opening balance sheet, dated as of October 8, 2021 (the "Opening Balance Sheet"), shows an implied stated equity value of $59.5 million comprised of $170.3 million of assets (including staggering new values of $25.5 million and $66.7 million for goodwill and intangible assets, respectively) and $110.7 million of liabilities (including the new $45 million of secured term debt).  Absent these new goodwill and intangible values created for the Opening Balance Sheet, and without any further adjustments, the implied post-closing equity value of PPG was $(32) million (i.e., negative $32 million).

26.     Several adjustments to the Opening Balance Sheet are warranted.

27.     First, the $92 million of newly valued goodwill and intangible assets was grossly overstated due to, among other things, (i) unrealistic and insufficient underlying projections, (ii) Godfrey's strained vendor relationships with Hisun and PPG's other suppliers and retailers, and (iii) adjustments that should have been made to the valuation analyses and other inputs utilized by management in preparing the Opening Balance Sheet.

28.     Second, the $9.1 million of inventory on hand reflected on the Opening Balance Sheet far exceeded its fair value.  As management recognized, the inventory on hand at this time was stale and undesirable.

29.     Third, PPG's working capital immediately prior to the closing of the LBO was grossly insufficient to operate the company on a go-forward basis, as discussed *infra*.

30.     These adjustments to the Opening Balance Sheet, once made, will demonstrate that PPG was rendered insolvent on a balance sheet basis immediately following the closing of the LBO.

**D.     LBO Leaves PPG Inadequately Capitalized and Unable to Pay Debts**

31.     The LBO also left PPG inadequately capitalized and unable to pay its debts as they came due.  Following the transfers made to the Defendants in connection with the LBO, PPG was left with approximately $5.3 million of cash and access to an undrawn $7.5 million revolver with Twin Brook.  As discussed *infra*, this cash and borrowing availability was grossly insufficient to sustain PPG's post-closing operations and pay its debts as they came due, including the substantial amounts owed and overdue to just Hisun and Tao.  Indeed, PPG's combined cash and borrowing availability of just $12.8 million at the closing of the LBO barely exceeded the $12.5 million that was then overdue to *Hisun alone*.

32.     PPG's current assets (less cash) of $70 million and current liabilities (less secured debt) of $70.4 million, each as set forth on the Opening Balance Sheet, indicate a non-cash working capital deficit of $0.4 million, or 0.2% of revenue.  Based on its 2021 revenue of $215.7 million, PPG had a non-cash working capital deficit of approximately $20 million to $30 million before even accounting for the new debt service obligations owed to Twin Brook following the LBO.

33.     Godfrey's solution to this problem was simple: "hope" that Hisun, Tao and other suppliers would continue to process new orders, and "pray" they would not demand payment of the tens of millions of dollars already owed them.  This strategy failed *immediately*.

34.     On October 8, 2021 – the same day the LBO closed – Godfrey caused PPG to place orders with Hisun to be manufactured and delivered during the first half of 2022, with staggered delivery dates from January through June 2022, at a cost of approximately $25 million (the

"October 2021 Order").  At the time this order was placed, PPG owed approximately $64.7 million to Hisun, approximately $12.5 million of which was overdue.

35.     In the weeks following the LBO closing, PPG used virtually all its available cash and drew nearly all of the $7.5 million revolver to pay approximately $17.9 million to Hisun in an effort to convince Hisun to begin manufacturing the October 2021 Order.

36.     On November 24, 2021, Hunter e-mailed Hisun, copying Godfrey, asking whether the $17.9 million payment was "enough progress for Hisun to start manufacturing the 2022 orders."  It was not.  PPG's $17.9 million payment had not materially reduced the balance owed to Hisun, which stood at approximately $64 million on November 24, 2021, because of deliveries made by Hisun in the interim on orders that pre-dated the October 2021 Order.

37.     Hisun e-mailed Hunter, copying Godfrey, in response that same day.  Hisun advised that it required payment of an additional $20 million to begin manufacturing the October 2021 Order.  Having already exhausted virtually all cash and borrowing availability to make the $17.9 million payment to Hisun, PPG could not come close to making this additional $20 million payment in late November 2021.

38.     Hunter responded to Hisun's e-mail, copying Godfrey, that same day and advised that he "would expect based on sales right now that you will get another $20 mm but it will take 2-3 weeks."  Fearing that Hisun's delayed production (caused by PPG's non-payment) would leave PPG without much-needed fresh inventory for January 2022, Hunter asked that Hisun commence at least some production for January.  Hisun would not.

39.     On November 29, 2021, Hunter e-mailed Hisun, copying Godfrey, a prioritized production schedule for January 2022 and advised that PPG would "need to cancel a lot of the orders for Jan/Feb. . . . We don't want these all to arrive in Feb or Mar so we need to cancel most

of what would have been arriving in January." Accordingly, unless the parties were to agree on a reduction in quantity for the October 2021 Order, the production delays caused by PPG's non-payment would not only result in a shortage of fresh inventory in January 2022, but also a surplusage of inventory in later months.

40.     On January 5, 2022, Hunter e-mailed Godfrey and Gentry to advise that "[a]t this point there is no way we are going to get any inventory in Q1.  Hisun won't begin production for 1-2 months and Tao has already sent us their plans for February being the first 2022 production." Without fresh Hisun and Tao inventory, PPG had no choice but to sell the stale and undesirable inventory on hand.  In his e-mail to Godfrey and Gentry, Hunter advised that PPG would need to sell $55 to $60 million of inventory in the first quarter to meet projections, and that while PPG had the inventory on hand to achieve those sales in theory, it "might not be what our customers want" given PPG's failure to obtain fresh inventory.  Hunter further advised that PPG was on track for sales of only $4 to $5 million in January if nothing changed, which was less than PPG's sales of $15 million in January 2021 and far less than management's projections for January 2022.  Hunter recognized that this result would be "a huge loss which we will have to explain to Kinderhook."

41.     Between December 1, 2021 and January 12, 2022, PPG made additional payments to Hisun totaling approximately $22 million.

42.     On January 12, 2022, Hisun advised PPG that it had authorized production of the October 2021 Order.

43.     On that same day, Hunter e-mailed Gentry and other PPG personnel, with a copy to Godfrey.  In view of PPG's disappointing January sales to date and the now expected delivery of the delayed October 2021 Order, Hunter advised that PPG was "WAY over inventoried right

now." Hunter advised that "[w]e still have time to stop future production" and asked his colleagues whether "[w]e need to re-evaluate any of these planned orders."

44.     Nevertheless, on January 13, 2022, PPG and Hisun agreed to maintain the quantity of the October 2021 Order, but to delay the delivery dates further into 2022.

45.     As of January 13, 2022 – despite the approximately $40 million paid to Hisun between October 21, 2021 and January 12, 2022 – PPG's payables to Hisun had been reduced by *only $7 million* from the LBO closing.

46.     Hisun continued to press PPG for additional payment.  On or around January 22, 2022, Godfrey sent Hisun a text message promising to initiate a wire in the amount of $7 million in the next four days.  Godfrey informed Hisun that he "just got a verbal commitment for our equity partners for at least a $7 million wire prior to the 26th.  That would bring us current through the 13th of January if our number[s] are correct. . . . I promise to get back to current."  Hisun continued production and shipment to PPG based on Godfrey's promises.

47.     But Godfrey's communications with Kinderhook that same day tell a different tale. Far from approving an equity contribution needed by PPG to pay Hisun, on January 22, 2022, Kinderhook's Kyle Dawson ("Dawson") e-mailed Hunter, copying Godfrey, with comments and questions relating to his review of PPG's 2021 financials.  With respect to PPG's cash flow, Dawson asked whether Hunter had prepared monthly cash flow analyses from the closing of the LBO so he could "figure out where all of our cash has gone!"  Dawson noted that "over the last ~2 months, it looks like we have drawn $6.5 million on the revolver" and that "[a]s of December, we have just over $1 million of cash on the balance sheet, so that means we went through $11.1 million of our cash in less than 3 months…."  Dawson questioned whether "we are paying Hisun

faster than we have been historically?  What are the working capital trends over the last 3 months (DPO, DIO, DSO)?"

48.    No equity contribution was agreed to or made by Kinderhook.  On January 25, 2022, PPG wired approximately $800,000 to Hisun – far less than the $7 million Godfrey had promised.

49.    Beginning in early February 2022, as PPG continued to struggle to meet its liquidity needs and first quarter revenue projections, Godfrey unilaterally implemented a 45-day price decrease for one of PPG's customers.  Godfrey permitted the customer to purchase products at a significant discount and gave the customer an approximately $600,000 rebate, both of which had a materially negative impact on PPG's margins and revenue.  Godfrey never discussed this price decrease with Kinderhook.  Kinderhook told Godfrey the following week that PPG had to raise prices to boost revenue.  Godfrey did not tell Kinderhook that he had done the exact opposite just days earlier.

50.    On March 1, 2022, the board of directors removed Hunter and elected Ken Vanden Berg as the new chief financial officer.  After his removal, Hunter was shifted to a new role by Godfrey as chief operating officer for a short period of time.

51.    On March 2, 2022, the Credit Agreement was amended to provide PPG with additional liquidity through the repayment of approximately $4.8 million of the then outstanding $7.5 million balance on the revolver.   The term loan was increased from $45 million to $50 million to reflect this additional borrowing by PPG.

52.    As of March 21, 2022, PPG owed Hisun approximately $65.2 million, of which $32.8 million was overdue.  Hisun had refused to place new orders.  At or around the same time, Tao was demanding payment of over $10 million.

53.     On or about March 21, 2022, Godfrey instructed Hunter to tell Hisun and Tao that wires would be forthcoming in two days.

54.     On March 24, 2022, Hunter e-mailed Godfrey regarding the payments to Hisun and Tao.  Hunter advised that these payments:

> "were contingent on drawing from the [revolver] which has not happened. We have basically zero in the bank as of today and I need to hoard another $600,000 to pay the Twin Brook interest payment on 3/31 so I don't see how we are going to get there with regular cash any time soon.  David at Tao asked me to email him when the wire went out and Cristina [at Hisun] was hitting me from multiple angles last night.  I have ignored them so far because I don't have a plan on when they might actually get wires.  Please let me know what comes out of today's meeting with Paul from [Kinderhook] about the line of credit.  If that does not work out then I don't have any idea what to tell them."

55.     PPG's rapid revenue decline continued alongside its liquidity crisis.  On March 28, 2022, Hunter e-mailed Godfrey and Gentry regarding the staff meeting scheduled for the following day.  Hunter advised that his staff report would show:

> "$85 mm in inventory between us and Tao on hand and another $20mm built with Hisun but not shipped – with only about $10mm of it accounted for on open POs.  The attached plan from October showed unit sales plans that added up to around $166mm in the first six months of 2022.  We will have about $30mm in actual sales in Q1 so we will be $136 mm short with 3 months remaining.  Even the first conservative budget we presented to Kinderhook that they shot down was $53 mm for Q1 and $132 mm for the first 6 months of 2022.  We would be at 57% of sales against that budget had it been approved by [Kinderhook]."

56.     As Hunter had predicted in early January, PPG's failure to obtain fresh inventory (the consequence of its inability to pay suppliers following the LBO) left the company to rely on inventory that "might not be what our customers want" to meet its substantial revenue projections. Moreover, PPG's disappointing sales of its existing inventory, coupled with the delivery of new inventory from the October 2021 Order (the quantity of which had not been reduced) and others,

forced the company to incur approximately $27.3 million in storage charges related to its inventory excess.

57.     As of April 5, 2022, PPG's payables to Hisun were approximately $65.4 million, with approximately $41.4 million overdue.  Hisun requested a meeting with Kinderhook to discuss PPG's financial situation.

58.     On April 20, 2022, Kinderhook met with Hisun.  Upon information and belief, Kinderhook was informed – for the first time – of the full extent of PPG's liabilities to Hisun, including overdue amounts that pre-dated the LBO.

59.     Two weeks later, Hunter corroborated what Kinderhook had learned from Hisun. On May 3, 2022, Hunter e-mailed Dawson (Kinderhook) to advise that:

> "[t]he last time we were current [with Hisun] was at the end of 2020.  All throughout 2021 we had payments overdue.  For the most part of the whole relationship with Hisun and Mr. Lee we have been late *and that is what basically funded cash flow*.  In August 2021 we were $14.5 M overdue.  In June 2021 we were $17 M overdue.  In April 2021 we were $20 M overdue. I can't find anything from Jan-March 2021 but clearly that is when the overdue balance grew quickly.  From $0 overdue to $20 M in 3-4 months."

(emphasis supplied).

60.     On that same day, Dawson e-mailed Hunter in response and questioned whether PPG's arrearages to Hisun were customarily seasonal, such that PPG would "pay back Mr. Li during the summer / end of the year as we collected receipts from season sales."  Hunter responded in the negative, advising Dawson that *"[w]e were certainly overdue at times all along the way. Again, it was how we managed cash flow*."  (emphasis supplied).

61.      On June 8, 2022, Godfrey was terminated for cause as chief executive officer of PPG.  Godfrey thereafter remained on the board of directors.

62.     In late 2022, PPG hired advisors to evaluate potential strategic alternatives and ultimately marketed its assets for sale as a going concern. Despite outreach to a broad universe of strategic and financial parties, PPG received no written indications of interest. Meanwhile, PPG continued to suffer a drain on cash flow, lacked a source of additional long-term liquidity and faced litigation and mounting pressure from vendors.

63.     Against this backdrop, PPG entered into an asset purchase agreement with CPS USA Acquisition, LLC to serve as a potential stalking horse purchaser in connection with a bankruptcy filing.

**E.      The Debtors' Chapter 11 Filings**

64.     On January 16, 2023 (the "Petition Date"), just over 15 months following the LBO, the Debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

65.     As of the Petition Date, the Debtors had approximately $52 million of secured debt owed to Twin Brook and $70 million of unsecured trade debt, including approximately $63.5 million owed to Hisun.

66.     On April 22, 2023, Godfrey filed a proof of claim against Investor in the amount of $62,640,000 for breach of contract. Two days later, on April 24, 2023, Godfrey filed an amended proof of claim against Investor in the amount of $62,640,000 for breach of contract, including $1,200,000 in annual salary, $1,200,000 in unpaid annual "bonus," $240,000 in unpaid director fees, $60 million in lost securities and indemnification in an unknown amount (as may be further amended, together with any other previously or subsequently filed claims, the "Godfrey Claim").

67.     On August 7, 2023, the Debtors filed the *Debtors' (A) Objection to Proof of Claim No. 27 Filed by Richard Godfrey and (B) Motion to Designate Plan Vote of Richard Godfrey Pursuant to 11 U.S.C. § 1126(e)* [Docket No. 437] (the "Claim Objection").

68.     The Debtors, Kinderhook and its affiliates, and Godfrey entered into a stipulation dated September 1, 2023 [Docket No. 462] (the "Stipulation").  Pursuant to the Stipulation, the parties agreed, among other things, that: (a) the Godfrey Claim would be reduced to $22.5 million (the "Reduced Godfrey Claim"), (b) the Debtors would accept the Reduced Godfrey Claim for voting purposes only, (c) the Debtors would withdraw without prejudice the Claim Objection, and (d) the parties would defer any objection on allowance of the Reduced Godfrey Claim for all other purposes until after confirmation of the Plan.

69.     After a sale of substantially all of the Debtors' assets, the Court confirmed the Plan on October 4, 2023 and entered the *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Second Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 487] (the "Confirmation Order").  The Plan went effective on October 19, 2023 (the "Effective Date").  *See* Docket No. 512.

70.     On the Effective Date, the Litigation Trust was established, Plaintiff was designated as the Litigation Trustee and the Litigation Trust Assets (as defined in the Plan) were transferred to the Litigation Trust.

71.     As set forth in the Plan and Confirmation Order, the Litigation Trustee was vested with authority to commence, prosecute and settle all claims of the Debtors against the Defendants, including the causes of action set forth herein.

## COUNT I

**(Constructive Fraudulent Transfer Under 11 U.S.C. § 548 (a)(1)(B) – Against All Defendants)**

72.     Plaintiff repeats and realleges each allegation set forth above and below as if fully set forth herein.

73.     On or about October 8, 2021, PPG transferred over $78 million of cash and other property to or for the benefit of Defendants in connection with the LBO.

74.     Specifically, PPG made the following transfers (collectively, the "Transfers"):

      a.     Not less than $69,848,532.99 in cash to Godfrey;

      b.     Not less than $4,943,550.31 in cancelled debt to Godfrey;

      c.     Not less than $1,491,901.91 in cancelled debt to Yerf-Dog, an affiliate of Godfrey, which was for Godfrey's benefit (together with the transfers in (a) and (b), the "Godfrey Transfers");

      d.     Not less than $1,200,000 in cash to Hunter (the "Hunter Transfer"); and

      e.     Not less than $1,200,000 in cash to Gentry (the "Gentry Transfer").

75.     Each of the Transfers was made within two years of the Petition Date.

76.     Each of the Transfers was a transfer of an interest in the property of PPG.

77.     Each of the Transfers was made in exchange for less than fair consideration and less than reasonably equivalent value.  In fact, PPG received no consideration through the LBO for any of the Transfers.  The Godfrey Transfers were made in exchange for the sale of most of his stock in PPG, and there was no contractual basis for the Hunter Transfer or the Gentry Transfer.

78.     The Godfrey Transfers rendered PPG insolvent.  As set forth in detail *supra*, the Opening Balance Sheet should be adjusted to account for PPG's stale inventory, and to significantly reduce or eliminate the value of goodwill and intangible assets to account for (i) unrealistic and insufficient underlying projections, (ii) Godfrey's strained relationships with Hisun and PPG's other suppliers and retailers, and (iii) adjustments that should have been made given the valuation method and other inputs utilized by management in preparing the Opening Balance Sheet.  Additionally, the Opening Balance Sheet should be adjusted to reflect PPG's grossly

overstated assets following the closing of the LBO.  After making these adjustments as may be determined by a valuation expert, and accounting for the additional $45 million of secured term debt used to finance the LBO and the reduction in assets on account of the cancelled debt for the benefit of Godfrey and his affiliate, PPG's liabilities far exceeded the fair valuation of its assets at the closing of the LBO.

79.     As discussed *supra*, PPG was also insolvent at the time of the Hunter Transfer and Gentry Transfer, which were made from scant available cash immediately following the closing on the LBO.

80.     In addition, at the time of each of the Transfers, PPG was engaged or was about to engage in a business or transaction for which the remaining property (including, most importantly, capital) was unreasonably small in relation to the business or transaction.  Following the LBO and its associated payments, including the gratuitous employee "bonuses" that were paid shortly thereafter, PPG had approximately $5.3 million of cash on the balance sheet and access to an undrawn $7.5 million revolver with Twin Brook.  This unreasonably small capital was not sufficient to sustain the company's post-closing operations as discussed *supra*.

81.     Moreover, at the time of each of the Transfers, PPG (through its agents, including the Defendants) intended, believed or reasonably should have believed that it would incur debts beyond its ability to pay as they came due.  As discussed *supra*, both before and after each of the Transfers, PPG placed orders with Hisun that PPG (through its agents, including the Defendants) intended, believed or reasonably should have believed it would be unable to pay for as they came due, as evidenced by the significant amounts owed and overdue to Hisun.

82.     Accordingly, each of the Transfers should be avoided as fraudulent pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

## COUNT II

**(Recovery of Avoided Transfers Under 11 U.S.C. § 550 – Against All Defendants)**

83.     Plaintiff repeats and realleges each allegation set forth above and below as if fully set forth herein.

84.     Pursuant to section 550 of the Bankruptcy Code, Plaintiff is entitled to recover from Godfrey the Godfrey Transfers, or the value of such transfers, and all other amounts for which Godfrey is liable to the estates.

85.     Pursuant to section 550 of the Bankruptcy Code, Plaintiff is entitled to recover from Hunter the Hunter Transfer, or the value of such transfer, and all other amounts for which Hunter is liable to the estates.

86.     Pursuant to section 550 of the Bankruptcy Code, Plaintiff is entitled to recover from Gentry the Gentry Transfer, or the value of such transfer, and all other amounts for which Gentry is liable to the estates.

87.     As set forth in Count I, the Transfers are subject to avoidance pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

88.     Godfrey was the initial transferee of the Godfrey Transfers or the person for whose benefit the Godfrey Transfers were made or the immediate or mediate transferee of such initial transferee.

89.     Hunter was the initial transferee of the Hunter Transfer or the person for whose benefit the Hunter Transfer was made or the immediate or mediate transferee of such initial transferee.

90.     Gentry was the initial transferee of the Gentry Transfer or the person for whose benefit the Gentry Transfer was made or the immediate or mediate transferee of such initial transferee.

91.     Accordingly, Plaintiff is entitled to recover from Godfrey, Hunter and Gentry the full amount or the value of the Godfrey Transfers, Hunter Transfer and Gentry Transfer, respectively, plus interest and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estate pursuant to section 550 of the Bankruptcy Code.

## COUNT III

**(Disallowance of Claims Under 11 U.S.C. § 502(d) and (j) – Against Godfrey)**

92.     Plaintiff repeats and realleges each allegation set forth above and below as if fully set forth herein.

93.     Godfrey filed a proof of claim against one or more of the Debtors, including without limitation the Godfrey Claim.

94.     Godfrey is the transferee of transfers avoidable under section 548 of the Bankruptcy Code, including without limitation the Godfrey Transfers.

95.     Godfrey is a person from which property is recoverable under section 550 of the Bankruptcy Code.

96.     Godfrey has not paid the amount of the Godfrey Transfers or turned over such property for which he is liable under section 550 of the Bankruptcy Code.

97.     Pursuant to section 502(d) of the Bankruptcy Code, any and all claims of Godfrey against Plaintiff, the Debtors or the Debtors' estate, including without limitation the Godfrey Claim, must be disallowed until such time as Godfrey pays Plaintiff an amount equal to the aggregate amount of all of the Godfrey Transfers, plus interest thereon and costs.

98.     Pursuant to section 502(j) of the Bankruptcy Code, any and all claims of Godfrey against Plaintiff, the Debtors or the Debtors' estate that were previously allowed must be

reconsidered and disallowed until such time as Godfrey pays to Plaintiff an amount equal to the aggregate amount of all of the Godfrey Transfers, plus interest thereon and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that the Court grant him the following relief against Defendants as follows:

(a)    On the First and Second Counts, judgment in favor of Plaintiff and against Defendants avoiding all Transfers and directing Defendants to return to Plaintiff the amount or value of their respective Transfers pursuant to sections 548 and 550 of the Bankruptcy Code, together with pre-judgment and post-judgment interest to the fullest extent allowable by law, together with the costs and expenses of this action, including without limitation attorneys' fees;

(b)    On the Third Count, judgment in favor of Plaintiff and against Godfrey reconsidering and disallowing any and all claims filed or held by Godfrey pursuant to section 502 of the Bankruptcy Code, including without limitation the Godfrey Claim;

(c)    Awarding Plaintiff pre-judgment and post-judgment interest and costs to the fullest extent allowable by law, including without limitation attorneys' fees; and

(d)    Granting Plaintiff such other and further relief as the Court deems just and proper.

Dated:  February 20, 2024
       Wilmington, Delaware

**COLE SCHOTZ P.C.**

*/s/ G. David Dean*

G. David Dean (No. 6403)
Justin Alberto (No. 5126)
Stacy L. Newman (No. 5044)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
Email: ddean@coleschotz.com
      jalberto@coleschotz.com
      snewman@coleschotz.com

- and -

Seth Van Aalten, Esq.
Sarah A. Carnes, Esq.
Julie Aberasturi, Esq.
1325 Avenue of the Americas, 19th Floor
New York, NY 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
Email: svanaalten@coleschotz.com
      scarnes@coleschotz.com
      jaberasturi@coleschotz.com

*Counsel to Plaintiff*