**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re:<br><br>PERFORMANCE POWERSPORTS GROUP INVESTOR, LLC, et al.,<br><br>Debtors. | ) | Chapter 11<br><br>Case No. 23-10047 (LSS)<br><br>(Jointly Administered) |
| PETER KRAVITZ, SOLELY IN CAPACITY AS LITIGATION TRUSTEE,<br><br>Plaintiff,<br>v.<br><br>RICHARD GODFREY, *et al.,*<br><br>Defendants. | ) | Adv. Pro. No. 24-50017 (LSS) |

**NON-PARTY KINDERHOOK INDUSTRIES, LLC's[1]**
**REPLY IN SUPPORT OF ITS CROSS-MOTION FOR A PROTECTIVE ORDER**

[1] Capitalized terms not defined herein have the same meanings as in the Cross-Motion.

# TABLE OF CONTENTS

**Page**

**INTRODUCTION** .......... 1

**ARGUMENT** .......... 3

- **A. The Memos Are Privileged Communications and Protected Work Product.** .......... 3
- **B. Kinderhook Forwarded the Memos Inadvertently.** .......... 3
- **C. Kinderhook Did Not Waive Work Product Protection, and the Substantial Need Exception Does Not Apply.** .......... 5
  - **1. Kinderhook's Inadvertent Disclosure Did Not Waive Work Product Protection over the Memos.** .......... 5
  - **2. Defendants Demonstrated No Substantial Need for the Memos.** .......... 7
- **D. Kinderhook Did Not Waive Privilege.** .......... 7
- **E. Protecting Privilege and Work Product Supplies Good Cause for this Court to Issue a Protective Order.** .......... 9

**CONCLUSION** .......... 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ameritas Life Ins. Corp. v. Wilmington Sav. Fund Soc'y, FSB*,
2024 WL 3653028 (D. Del. Aug. 5, 2024) .......... 4

*In re Cendant Corp. Sec. Litig.*,
343 F.3d 658 (3d Cir. 2003) .......... 7

*Fid. & Deposit Co. of Md. v. McCulloch*,
168 F.R.D. 516 (E.D. Pa. 1996) .......... 2, 9

*Harmony Biosciences, LLC v. Lupin Ltd.*,
2025 WL 3527010 (D. Del. Dec. 2, 2025) .......... 2, 9

*Magnetar Techs. Corp. v. Six Flags Theme Park Inc.*,
886 F. Supp. 2d 466 (D. Del. 2012) .......... 6, 7, 8

*Regeneron Pharms., Inc. v. Amgen, Inc.*,
2024 WL 5431484 (D. Del. Aug. 26, 2024) .......... 4

*Sampson Fire Sales, Inc. v. Oaks*,
201 F.R.D. 351 (M.D. Pa. 2001) .......... 8

*Sandoz Inc. v. Lannett Co.*,
570 F. Supp. 3d 258 (E.D. Pa. 2021) .......... 9

*Westinghouse Elec. Corp. v. Republic of Phil.*,
951 F.2d 1414 (3d Cir. 1991) .......... 5, 6

# INTRODUCTION

Defendants' Extension Motion turns on three issues: (i) are the two Memos—which were prepared by and at the direction of Kinderhook's attorneys in connection with ongoing litigation—protected by the work product doctrine and the attorney-client privilege; (ii) if so, were those protections waived when Kyle Dawson, a vice president at Kinderhook, inadvertently sent the Memos to the Chief Financial Officer of a Kinderhook portfolio company (Champion/PPG) for purposes of paying the corresponding attorney invoice (and had no control over or knowledge of the chain of events that led to any subsequent disclosures); and (iii) even if there was a waiver, is there good cause to extend the fact discovery deadline.[2]

On the first issue, there is no question that the Memos are protected by the work product doctrine and attorney-client privilege—which likely explains why, in their Response, Defendants abandoned the half-hearted arguments to the contrary they made in their Extension Motion. Indeed, as the Memos themselves establish, they were prepared in connection with ongoing litigation [redacted]. As such, the Memos are quintessential work product and attorney-client privileged communications.

As to the second issue of waiver, Defendants' arguments are based on a fundamental mischaracterization and misunderstanding of the facts surrounding the disclosure of the Memos. To begin, Defendants repeatedly assert that Kinderhook disclosed the Memos to multiple third parties, including Champion/PPG, whom Defendants characterize as "an unrelated third party." That is simply incorrect. Champion/PPG was not an "unrelated third party"; instead, it was a

---

[2] As in the Cross-Motion, in this Reply Kinderhook does not address whether good cause exists under Rule 16(b) to modify the scheduling order, and, as a non-party, does not address the admissibility of the Memos at trial. Both of these issues have been addressed by the Litigation Trustee. (Cross-Motion at 2 n.1; D.I. 230.)

portfolio company owned by Kinderhook. And the Chief Financial Officer of that Kinderhook portfolio company was the only person who received the Memos from Kinderhook.

Lacking any factual or legal basis for their positions, Defendants attempt to salvage their waiver argument with a convoluted argument that "common sense" and the "timeline" indicate that Kinderhook intentionally shared the Memos with the CFO of its portfolio company. But that too makes no sense, as even a quick review of the underlying transmittal emails reveals. In those emails, Mr. Dawson refers only to the invoice and says nothing about the Memos. (Gerding Decl. Ex. 1 at DEF011557.) Common sense suggests that, were the Memos sent intentionally, the emails would mention them. Moreover, the timeline establishes that those emails were sent immediately after a request for payment had been made by Kinderhook's attorneys at Kirkland. And, contrary to what Defendants now claim, there is nothing unusual about a private equity firm passing on costs to a portfolio company that it incurs as a result of its ownership of that company.

Tellingly, Defendants never grapple with the legal standard necessary to establish waiver of work product or the attorney-client privilege. As to work product, Defendants fail to explain how, in sending the invoice to the CFO of a Kinderhook portfolio company, Mr. Dawson consciously disregarded a risk that a Kinderhook adversary might someday obtain the Memos. And, as to privilege, Defendants do not even acknowledge, let alone apply, the five-factor test that governs whether an inadvertent disclosure constitutes a waiver.

Because the Memos are privileged and protected by the work product doctrine, and because Kinderhook did not waive those protections, there is good cause for a protective order to prevent Defendants from keeping or using them. *See Fid. & Deposit Co. of Md. v. McCulloch*, 168 F.R.D. 516, 522 (E.D. Pa. 1996) (protection of attorney-client privilege from disclosure establishes good cause); *Harmony Biosciences, LLC v. Lupin Ltd.*, 2025 WL 3527010, at *3 (D. Del. Dec. 2, 2025)

(protection of work product from disclosure establishes good cause). Defendants' stated plan for the Memos—to disclose and use them at trial—would cause precisely the sort of injury these protections exist to prevent.

The Court should grant the Cross-Motion.

**ARGUMENT**

**A. The Memos Are Privileged Communications and Protected Work Product.**

The Memos are privileged communications and protected work product for the reasons described in the Cross-Motion at pages 12-17. This is confirmed in the email chain at the center of these competing motions, which states that [redacted] (Gerding Decl. Ex. 1 at DEF011573.) Even Tort Case Counsel, who sent the Memos to Godfrey, understood that they were litigation material prepared for the Hisun litigation. (Bartlett Dep. 95:4–12.)

Against the backdrop of these undisputed facts, Defendants make no effort to substantiate their initial characterization of the BRG Memo as an unprotected "general corporate document[]." (D.I. 194 at 20; Cross-Motion at 14.) Defendants instead argue only that privilege was waived—that, because the Memos were inadvertently sent to the CFO of Kinderhook's portfolio company, they "were not treated as" privileged, and thus that "any privilege or protection" was "extinguished in 2024." (Reply at 2, 6, 7; Response at 3.) Those arguments fail for the reasons described in the Cross-Motion and below.

**B. Kinderhook Forwarded the Memos Inadvertently.**

Kinderhook's Mr. Dawson inadvertently sent the Memos to the CFO of a Kinderhook portfolio company in the manner described in the Cross-Motion at 7-8. But his intent to send *the emails* does not mean he intended to disclose *the attached Memos*. In fact, it is well-settled that a

disclosure may be inadvertent even if it occurs within the context of an intentional communication. (*See* Cross-Motion at 21–22, citing *Ameritas Life Ins. Corp. v. Wilmington Sav. Fund Soc'y, FSB*, 2024 WL 3653028, at *1 (D. Del. Aug. 5, 2024); *Regeneron Pharms., Inc. v. Amgen, Inc.*, 2024 WL 5431484, at *2 (D. Del. Aug. 26, 2024)).

Defendants do not dispute these principles or authorities. They instead speculate, without support, that Mr. Dawson forwarded the Memos on purpose. To support this claim, Defendants point only to "common sense." (Response at 3.) They assert that, because Mr. Dawson intended to forward the invoice, he must have intended to forward the Memos as well, because "one would, logically, include the final product(s) alongside the bill." (*Id.*)

Defendants are wrong. Mr. Dawson's lack of intent to send the Memos is apparent from the face of the emails, which refer only to a single invoice—the sole document he intended to forward for purposes of payment. On April 30, 2024, he forwarded an email and asked, "can you get **this** paid?" (Gerding Decl. Ex. 1 at DEF011557 (emphasis added).) On May 10, 2024, he followed up: "Dale — legal just checked in on **this one** again." (*Id.* (emphasis added).) Defendants relatedly claim, without authority, that it is unusual for a private equity firm to send an invoice to a portfolio company for payment. (Response at 3–4.) They are wrong about that, too—particularly where, as here, the costs were incurred as a result of Kinderhook's ownership of Champion/PPG.

Mr. Dawson nowhere references the Memos or suggests that anything but the invoice was forwarded. He refers to one item—"**this**" and "**this one**"—*i.e.*, the invoice alone. That the forwarded chain displayed three attachments shows nothing. (Response at 4.) Mr. Dawson was forwarding counsel's existing email, which itself asked only that "this invoice" be paid, and the attachments simply went along with the chain. In short, Mr. Dawson's emails do not support the

suggestion that he intended to send the Memos, let alone that he intended, as Defendants theorize, to send the Memos "as an explanation to [the portfolio company] as to what it was being asked to pay for and why." (Response at 3–4.)

### C. Kinderhook Did Not Waive Work Product Protection, and the Substantial Need Exception Does Not Apply.

#### 1. Kinderhook's Inadvertent Disclosure Did Not Waive Work Product Protection over the Memos.

Because the Memos were inadvertently forwarded, whether work product protection was waived depends on the "conscious disregard" framework described in *Westinghouse Elec. Corp. v. Republic of Phil.*, 951 F.2d 1414, 1431 (3d Cir. 1991). As described in the Cross-Motion at pages 17-19, no waiver occurred because Mr. Dawson's forwarding of an invoice to a portfolio company executive did not "evidence[] [a] conscious disregard of the possibility that an adversary might obtain" the Memos. (*Id.*, quoting *Westinghouse*, 951 F.2d at 1431).

Despite their suggestions that Kinderhook disclosed the Memos to multiple third parties, Defendants identify no disclosure by Kinderhook to any adversary whatsoever—not Hisun, not Defendants, not anyone else. Nor do they identify a single fact or circumstance that suggests Kinderhook consciously disregarded the possibility that Defendants would obtain the Memos long after they were created. Indeed, Defendants admit they obtained the Memos only through a convoluted eight-step chain of transfers that took more than 18 months to occur: "Reid Collins & Tsai LLP > Kirkland & Ellis > Kinderhook > Champion/PPG > Trustee Peter Kravitz > Trustee's ESI Vendor > Loeb Law Firm > Richard Godfrey > Kutak Rock." (Reply at 9.)

It is simply not credible for Defendants to claim that Mr. Dawson, by inadvertently including the Memos when he forwarded an invoice to Kinderhook's own portfolio company, could have reasonably believed that the Memos would be obtained by an adversary. This is particularly true given the circumstances that led to the Memos being obtained by Defendants:

they fell outside the date window that applied to the collection; slipped through a metadata filter; and were discovered only after an accidental download of an entire document "family." (Bartlett Dep. 52, 56–58, 83, 95.)

Ignoring all this, Defendants rest on the irrelevant point that Mr. Dawson's emails "did, in fact, ultimately 'enable[] an adversary to gain access to the information.'" (Response at 5.) That is not the test. Instead, "Third Circuit courts hold 'when the disclosure is either inadvertent or made to a non-adversary, it is appropriate to ask whether the circumstances surrounding the disclosure evidenced conscious disregard of the possibility that an adversary might obtain the protected materials.'" *Magnetar Techs. Corp. v. Six Flags Theme Park Inc.*, 886 F. Supp. 2d 466, 478 (D. Del. 2012) (quoting *Westinghouse*, 951 F.2d at 1431), *aff'd*, 2014 WL 545440 (D. Del. Feb. 7, 2014). If an adversary's eventual access were sufficient to establish a waiver, then the inquiry would begin and end with whether the adversary has the document, and there would be no need to examine "the circumstances surrounding the disclosure." *Id*.

That is plainly not the law. Applying *Westinghouse* to this case, Mr. Dawson's emails were "inadvertent" ***and*** to a non-adversary. *Westinghouse*, 951 F.2d at 1431. Indeed, it is difficult to imagine a third party less adversarial to Kinderhook than the CFO of one of its portfolio companies. And it is difficult to imagine a transfer pathway less predictable than the 18-month odyssey that brought the Memos to the Defendants.

Finally, Defendants concede that "[t]he alleged privilege asserted was not the Trustee's; it was Kinderhook's" (Reply at 6 & n.18), which undermines their reliance on the supposed "series of intentional disclosures to several different entities and individuals." (Response at 3.) No subsequent disclosure was by Kinderhook—the only party capable of making a waiver—and Kinderhook's own disclosures were inadvertent for the reasons explained above.

### 2. Defendants Demonstrated No Substantial Need for the Memos.

As explained in the Cross-Motion at pages 20-21, because the Memos qualify as opinion work product, they receive "near absolute protection" that may be disregarded only in "rare and exceptional circumstances." (*Id.*, quoting *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 663 (3d Cir. 2003).) Defendants ignore this standard and appear to abandon the claim of substantial need they initially raised in the Extension Motion. (*See* D.I. 194 at 17–18.) Neither their Response nor their Reply mentions it or attempts to show the rare and exceptional circumstances that would be required.

### D. Kinderhook Did Not Waive Privilege.

Kinderhook's inadvertent forwarding of the Memos did not waive the protection afforded by the attorney-client privilege. Because the Memos were shared inadvertently, whether a privilege waiver occurred depends on the five-factor framework described in *Magnetar*, 886 F. Supp. 2d at 478. For the reasons described in the Cross-Motion at pages 21-24, all five factors confirm that no waiver occurred.

Defendants cite *Magnetar* only in a footnote, and only for its recitation of the standard for waiver of work product—not privilege. (Response at 5, n.11.) As to privilege, Defendants do not dispute that *Magnetar*'s five-factor standard governs, yet they do not attempt to apply the factors here. Nor do Defendants address the Cross-Motion's application of those factors at pages 21-23.

The few points Defendants raise that relate incidentally to *Magnetar*'s five-factor test are unavailing. First, Defendants assert that Kinderhook "took zero steps to prevent disclosure." (Response at 5 (emphasis omitted).) Not so. Kinderhook's counsel conducted a privilege review of Kinderhook's entire 11,547-document production and did not produce the Memos as part of Kinderhook's production. (Cross-Motion at 22.) Second, there is no merit to their contention that Kinderhook "never ma[de] any attempt to clawback" the Memos when Mr. Dawson sent them

again "just two weeks later." (Response at 4.) The two emails were sent on April 30 and May 10, 2024—ten days apart, as part of the same chain, to the same person. (Cross-Motion Ex. 3.) And, because the Memos were sent inadvertently, it would not have made sense for Kinderhook to claw them back.

Nor does it matter that Kinderhook did not act "until April 2026, two years after" they were inadvertently shared. (Reply at 9.) Kinderhook's diligence must be measured from when it learned the Memos were disclosed, not from when the disclosure happened. *Cf. Sampson Fire Sales, Inc. v. Oaks*, 201 F.R.D. 351, 361 (M.D. Pa. 2001). Kinderhook learned about the disclosure only when Defendants' counsel served their sealed Extension Motion on April 3, 2026, and Kinderhook's counsel demanded withdrawal the next day. (Cross-Motion at 12 & at Ex. 1.) More fundamentally, having successfully concealed their possession of the Memos for over four months, Defendants cannot credibly complain that Kinderhook should have demanded them back sooner.

Worse still, Defendants continue to claim that they "***did not know the Memoranda existed***" before December 8, 2025. (Reply at 11 (emphasis added).) Yet the record shows otherwise. On November 13, 2025, Ms. Bartlett texted Godfrey that she had emailed him "kinderhook's analysis" and described it as "a lengthy analysis from their attorneys talking about your other suit"; Godfrey responded, "Perfect. Thank you." (Bartlett Ex. 8; Bartlett Dep. 81:24–83:1.) Defendants offer no explanation for their prolonged failure to notify Kinderhook, which "weighs against a waiver." *Magnetar*, 886 F. Supp. 2d at 484. And they offer no explanation for the disconnect between their claimed ignorance until December 2025 and the communications that show they knew what they had the month before.

There is likewise no merit to the arguments that "Kinderhook's counsel inappropriately withheld the Memoranda from disclosure during discovery," that "[t]he Trustee and Kinderhook

failed to timely disclose the Memoranda," or that the Memos "were never even logged as privileged by the Trustee or Kinderhook." (Reply at 2–3, 12.) Kinderhook is not a party to this case, and Defendants cite nothing to support their claim that Kinderhook "allowed the Memoranda to be shared with the Trustee." (*Id.* at 2.) The privilege log that Defendants criticize was created by the Trustee—not Kinderhook—and has no bearing on Kinderhook's privilege or work product.

Finally, instead of addressing *Magnetar*'s privilege waiver framework, Defendants devote pages to arguing that the common-interest doctrine does not apply, rebutting an argument Kinderhook has never made. (Reply at 8–9.)[3] To be clear, Kinderhook is not relying on the common-interest doctrine to protect the Memos. Instead, as discussed at length, the disclosure of the Memos must be analyzed under waiver principles. And here, because Mr. Dawson forwarded the Memos inadvertently to a non-adversarial party, no waiver of privilege or work product protection occurred.

**E. Protecting Privilege and Work Product Supplies Good Cause for this Court to Issue a Protective Order.**

This Court has good cause to enter a protective order because the attorney-client privilege and work product protection apply and were not waived. That showing alone suffices, as explained in the Cross-Motion at pages 24-25. *See Fid. & Deposit Co.*, 168 F.R.D. at 522 (attorney-client privilege establishes good cause); *Harmony Biosciences*, 2025 WL 3527010, at *3 (work product establishes good cause). Defendants address neither case, and instead just recite the general standards from *Pansy* and *Publicker*. (Response at 2–3 & nn.3–4.)

[3] Defendants' reliance on *Sandoz Inc. v. Lannett Co.*, 570 F. Supp. 3d 258, 266–67 (E.D. Pa. 2021), for the proposition that copying a third party waives privilege over attachments (Reply at 8–9) fares no better. *Sandoz* did not involve an inadvertent disclosure, which is what occurred here. And whether an inadvertent disclosure effects a waiver is governed by *Magnetar*'s five-factor test, which Defendants never apply.

As Defendants make clear, they intend to utilize Kinderhook's work product and privileged information. That is the precise type of injury a protective order is designed to prevent. Nor does filing under seal help. (Response at 3.) The harm is not only public disclosure, but also an adversary's use of the work product and privileged information, which sealing does nothing to cure.

## CONCLUSION

For the foregoing reasons and those set forth in the Cross-Motion, Kinderhook respectfully requests that the Court deny the Extension Motion insofar as it seeks a determination that privilege or work product protection over the Memos was waived, and grant Kinderhook's Cross-Motion for a protective order (i) requiring Defendants and their counsel to return or destroy the Memos and any other privileged Kinderhook documents or information, including all copies, notes, and derivative materials; (ii) prohibiting any use or disclosure of those materials or their contents; (iii) requiring Defendants to identify every person to whom they or their contents were disclosed; and (iv) requiring a certification of compliance within seven days.

Dated: November 13, 2026
Wilmington, Delaware

/s/ Laura Davis Jones

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Edward A. Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
joneill@pszjlaw.com
ecorma@pszjlaw.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
William E. Arnault (admitted pro hac vice)
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: william.arnault@kirkland.com

*Attorneys for Non-Party Kinderhook Industries, LLC*